IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RENEE FRANKLIN

    v.                     :   Civil Action No. DKC 14-0497

CLARENCE JACKSON, et al.

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Church dispute is the motion to dismiss or, in the alternative, for summary judgment, filed by Defendants Clarence Jackson, Gloria McClam-Magruder, Denise Killen, Clifford Boswell, Dorothy Williams, Lynda Pyles, and Jericho Baptist Church Ministries, Inc.[1] (ECF No. 7). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendants' motion will be granted.

## I.  Background

This lawsuit arises from a longstanding dispute concerning the control and governance of Jericho Baptist Church Ministries, Inc. ("the Church"), located in Landover, Prince George's County, Maryland. The sanctuary is known as the "Jericho City of Praise." (ECF No. 7-19).

---

[1] The parties refer to Jericho Baptist Church Ministries, Inc. as the "Nominal Defendant."

Plaintiff Renee Franklin ("Plaintiff") brings this action derivatively on behalf of the Church against Defendants Clarence Jackson, Gloria McClam-Magruder, Denise Killen, Clifford Boswell, Dorothy Williams, and Lynda Pyles (collectively, "the Board" or "Defendant Trustees"), who are trustees on the Board of Jericho Baptist Church Ministries, Inc. ("Jericho Maryland"), a Maryland non-stock religious corporation formed to manage the assets, estate, property, interests, and inheritance of the Church. (ECF No. 7-8).[2] According to the complaint, in 1962, the late Bishop James R. Peebles, Sr. and Apostle Betty Peebles created a District of Columbia non-profit religious corporation to conduct business on behalf of the Church. (ECF No. 1 ¶ 15). According to Plaintiff, in 1996, the Board of Trustees consisted of Apostle Betty Peebles (now deceased), James Peebles, Jr. (now deceased), Anne Wesley, and Defendant Dorothy Williams. (*Id.* ¶ 16). Bishop Joel Peebles joined the Board in 1997. (*Id.* ¶ 17). That board held office until October 2010. (Id. at ¶ 18). Apostle Betty Peebles died on October 12, 2010. (*Id.* ¶ 19). Plaintiff asserts that "[a]fter Apostle Betty Peebles' passing, the individual Defendants seized control of the Church by and through illicit and clandestine means, which included but [were]

---

[2] In reviewing a motion to dismiss, the court may consider allegations in the complaint, matters of public record, and documents attached to the motion to dismiss that are integral to the complaint and authentic. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

not limited to: fraud, forgery, and misrepresentation." (*Id.* ¶ 20).

Plaintiff asserts that Defendant Trustees "seized" control of the Board following the death of Apostle Betty Peebles, but did not announce their seizure to the Plaintiff, the congregation, or the 1997 Board. (*Id.* ¶ 21). Plaintiff alleges that soon after Defendant Trustees gained control of the Church, Defendant Trustees elected to dissolve the District of Columbia charter and create a Maryland charter. (*Id.* ¶ 23). The District of Columbia entity merged into the successor Maryland entity; articles of merger were filed on November 1, 2010. (ECF Nos. 7-3). Plaintiff asserts that the individual Defendants voted themselves as the Trustees on the Board of the Maryland charter on October 30, 2010. (ECF No. 1 ¶ 24). The individual Defendants filed Articles of Incorporation, which were accepted by the Maryland Department of Assessments and Taxation on December 15, 2010. (ECF No. 7-8). The Articles of Incorporation state that the individual Defendants have been elected by the Members of the congregation of Jericho Baptist Church Ministries, Inc. to serve as trustees "in the name and on behalf of the Church to manage its assets, estate, property, interests and inheritance." (*Id.* at 3).

Plaintiff filed a complaint on February 20, 2014, asserting six causes of action: (1) breach of fiduciary duty (count I);

(2) gross mismanagement (count II); (3) unjust enrichment (count III); (4) gross waste of corporate assets (count IV); (5) noncompliance with Md. Code, Corps. & Assoc. § 5-302 (count V)[3]; and (6) civil conspiracy (count VI). (ECF No. 1). The complaint asserts that Defendants have caused the congregational membership to plummet from 15,000 members to what is now a mere thirty (30) members. (ECF No. 1 ¶ 35). Plaintiff further alleges that tithes and offerings have diminished in excess of ninety percent and Defendants have hired themselves to run and operate the daily operations of the Church. (*Id.* ¶¶ 37-38). The complaint further avers that "immediately upon taking office[,] Defendants[] Williams, Killen, and Jackson all voted for themselves to receive substantial pay raises in the thousands of dollars. Furthermore, Defendants[] Jackson and Killen have received the highest pay raises in the history of the [Church], and those raises were provided without justification." (*Id.* ¶ 40). Plaintiff believes that Defendants Killen and Jackson are embezzling money from the Church "in the hundreds of thousands of dollars." (*Id.* ¶ 43). Finally, Plaintiff asserts that "Defendants have terminated the congregational membership of those [who] have questioned any of their illicit actions and behavior." (*Id.* ¶ 41).

---

[3] Plaintiff mislabels this as count IV in her complaint, but it should be count V. Moreover, this is the only claim that Plaintiff asserts as a direct, rather than a derivative, claim.

Defendants moved to dismiss or, in the alternative, for summary judgment.  (ECF No. 7).  Plaintiff opposed the motion (ECF No. 10), and Defendants replied (ECF No. 11).

## II. Analysis

Defendants make multiple arguments for dismissal.  First, Defendants argue that the Nominal Defendant should be realigned as a plaintiff, thereby destroying complete diversity. Alternatively, Defendants assert that this case should be dismissed or stayed under the *Colorado River* abstention doctrine.  Defendants also argue that: Plaintiff lacks standing to bring this derivative action because she is not a member of the Church; the complaint fails to plead demand futility required for derivative lawsuits; the claim for breach of fiduciary duty does not survive dismissal; Plaintiff's claim for violation of Md. Code Ann. Corps. & Assocs. § 5-302 is time-barred and otherwise subject to dismissal; and civil conspiracy is not an independent cause of action and also is time-barred. (ECF No. 7-1, at 17-21).

### A. Diversity Jurisdiction

Although diversity jurisdiction is disputed, neither side disputes the citizenship of the parties.  Plaintiff is a citizen of the District of Columbia.  With the exception of Defendant Denise Killen, who resides in Virginia, the remaining Defendant Trustees and Jericho Maryland, the Nominal Defendant, are

citizens of Maryland.  (*See* ECF No. 1 ¶¶ 4-12).  Defendants argue that "Jericho Maryland is the true plaintiff, as the suit has been brought to redress the injuries suffered and to be suffered by the Nominal Defendant."  (ECF No. 7-1, at 9) (internal quotation marks omitted).  Defendants state that realigning Jericho Maryland as a plaintiff destroys complete diversity because all but one of the Defendant Trustees are citizens of Maryland.

"In a derivative suit, the corporation . . . is initially named as a defendant to ensure its presence, after which it may be aligned according to its real interests."  *Office of Strategic Services, Inc. v. Sadeghian*, 528 F.App'x 336, 349 (4th Cir. 2013); *Smith v. Sperling*, 354 U.S. 91, 97 (1957).  In a derivative suit, "[t]he claim pressed by the stockholder against directors or third parties is not his own but the corporation's."  *Ross v. Bernhard*, 396 U.S. 531, 538 (1970). Plaintiff argues that in derivative actions, courts must look for the presence of "antagonism" between the shareholders and corporate management.  Plaintiff premises her argument on *Doctor v. Harrington*, 196 U.S. 579 (1905) and *Smith v. Sperling*, 354 U.S. 91 (1957).  "At times, [] the nominal corporate party, on whose behalf the suit is brought, may be antagonistic to the shareholder plaintiff."  *Racetime Investments, LLC v. Moser*, Civ. Action No. 3:12CV860-HEH, 2013 WL 987834, at *2 (E.D.Va.

Mar. 8, 2013). *Smith*, 354 U.S. at 95, clarified that antagonism exists "whenever the management is aligned against the stockholder and defends a course of conduct which he attacks." The question of whether to realign the corporation as a plaintiff is "a practical not a mechanical determination and is resolved by the pleadings and the nature of the dispute." *Smith*, 354 U.S. at 97.

The complaint asserts breach of fiduciary duties, self-dealing, embezzlement, and mismanagement of Church funds by Defendant Trustees. Further, Plaintiff alleges that "anyone who questions the activities of the [Trustees] has been silenced in one form or another." (ECF No. 1, at 9). Plaintiff further avers that "[e]ach of the trustees and officers authorized the illegal actions of the Board" and "[i]n order to bring this suit[,] [] Defendants would be forced to sue themselves and persons [with] whom they have extensive business and personal entanglements." (*Id.*); *see, e.g.*, *Sadeghian*, 528 F.App'x at 349 ("[I]f the complaint in a derivative action alleges that the controlling shareholders or dominant officials of the corporation are guilty of fraud or malfeasance, then antagonism is clearly evident and the corporation remains a defendant.") (*quoting Liddy v. Urbanek*, 707 F.2d 1222, 1224-25 (11th Cir. 1983)). Considering the allegations in the complaint, and the nature of the dispute, antagonism exists.

Defendants' reliance on *General Technology Applications, Inc. v. Exro LTDA*, 388 F.3d 114 (4th Cir. 2004), in support of realigning Jericho Maryland as a plaintiff, is misplaced. In that case Exro Ltda. ("Exro"), a Columbian corporation, and GTA, Inc. ("GTA"), a Virginia corporation, formed a limited liability company, EXG, L.L.C. ("EXG"), to pursue a joint venture together. *Id.* at 117. Naming EXG as a nominal defendant, Exro asserted several derivative claims against GTA on behalf of EXG for GTA's alleged failure to make a required capital contribution and to meet other obligations under the operating agreement. *Id.* at 116-17. The United States Court of Appeals for the Fourth Circuit found that the jointly-created LLC, EXG, was a real party in interest because the controversy centered on legal rights belonging to EXG. *Id.* at 121 n.3. Notably, the Fourth Circuit concluded that *no matter how it aligned EXG*, diversity did not exist. If the court aligned EXG as a defendant, then Exro, a Colombian citizen, would be suing EXG, another Colombian citizen. If EXG was characterized as a plaintiff, EXG, a citizen of Virginia as well as Colombia, would be suing GTA, another citizen of Virginia. Thus, the Fourth Circuit did not need to resolve the realignment issue because diversity was destroyed regardless. *Gen. Tech.* pointed out, however, that "[g]enerally, the represented entity (i.e., the

entity on whose behalf the suit is initiated). . . is aligned as a defendant." *Id.* at 120.

Based on the foregoing, the Nominal Defendant need not be realigned as a plaintiff here.

### B. *Colorado River* Abstention

Defendants next argue that this action should be dismissed or stayed pursuant to the doctrine established by the Supreme Court of the United States *in Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

Generally, "our dual system of federal and state governments allows parallel actions to proceed to judgment until one becomes preclusive of the other." *Chase Brexton Health Services, Inc. v. Maryland*, 411 F.3d 457, 462 (4th Cir. 2005). Thus, the mere fact that an action is pending in a state court "is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *McLaughlin v. United Va. Bank*, 955 F.2d 930, 934 (4th Cir. 1992) (internal marks omitted). Indeed, "federal courts are bound by a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Chase Brexton*, 411 F.3d at 462 (*quoting McClellan v. Carland*, 217 U.S. 268, 282 (1910)).  It is well established, however, that "federal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing

interest.'"  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (*quoting Colorado River*, 424 U.S. at 813).   The "exceptional circumstances" in which abstention is appropriate "inevitably relate to a policy of avoiding unnecessary constitutional decisions of accommodating federal-state relations."  *Chase Brexton*, 411 F.3d at 462.   "Abstention from the exercise of federal jurisdiction is the exception, not the rule."  *Colorado River*, 424 U.S. at 813.

The "threshold question in deciding whether *Colorado River* abstention is appropriate is whether there are parallel federal and state suits."  *Chase Brexton*, 411 F.3d at 463.   If the suits are parallel, the court must balance a number of factors in considering whether "exceptional circumstances" are presented, thereby warranting its abstention.  *See Gannett Co v. Clark Constr. Group, Inc.*, 286 F.3d 737, 741 (4th Cir. 2002).

"Simultaneous federal and state suits are deemed parallel if 'substantially the same parties litigate substantially the same issues.'"  *Extra Storage Space, LLC v. Maisel-Hollins Development, Co.*, 527 F.Supp.2d 462, 466 (D.Md. 2007) (*quoting New Beckley Mining Corp. v. Int'l Union, UMWA*, 946 F.2d 1072, 1073 (4th Cir. 1991)).   The similarity of the suits is generally assessed in terms of the identity of the parties, the legal issues, and the remedies sought in the respective cases.  *See Great American Ins. Co. v. Gross*, 468 F.3d 199, 207-08 (4th Cir.

2006).  "Although the parties in the concurrent suits need not be identical, the Fourth Circuit has strictly construed the requirement that the parties be substantially the same."  *Extra Storage Space, LLC v. Maisel-Hollins Development, Co.*, 527 F.Supp.2d 462, 466 (D.Md. 2007).

Defendants argue that there is a similar action currently pending in the Circuit Court for Prince George's County: *Board of Trustees of Jericho Baptist Church Ministries, Inc. v. Joel R. Peebles, Sr., et al.*, Case No. CAL10-33647 ("*Trustees v. Peebles*").  On October 19, 2010, the Board of Trustees of the Jericho Baptist Church Ministries filed a complaint in the Circuit Court for Prince George's County against Joel R. Peebles, Sr. and William Meadows, formerly associated with the Church, alleging that Mr. Peebles and Mr. Meadows were not trustees of the Church, but that nonetheless they had engaged in conduct seeking to establish their control of the Church.  The second amended complaint against Joel Peebles and Williams Meadows includes the following causes of action: (1) temporary restraining order and preliminary injunction; (2) declaratory relief; (3) misappropriation of funds; and (4) accounting. (*See* Case No. 13-cv-02586-PJM, at ECF No. 37).[4]  Mr. Peebles and Mr.

---

[4] Mr. Peebles and Mr. Meadows later filed a Third-Party Complaint against the State of Maryland, Sheriff High, Prince George's County, and Sheriff's Deputies Michael Simms and Kevin Massie, asserting state law claims and a violation of 42 U.S.C.

Meadows counterclaimed against both Jericho Maryland and individual board members, alleging that the trustee members were not in fact lawful members, and that they, not Mr. Peebles and Mr. Meadows, had unlawfully seized control of the Church. On October 24, 2011, the Circuit Court for Prince George's County granted summary judgment in favor of the Board of Trustees of Jericho Maryland, decreeing that the existing Board members indeed were the lawful Board of the Church, and permanently enjoining Mr. Peebles and Mr. Meadows from interfering with Church operations. *See Jericho Baptist Church Ministries, Inc. v. Peebles*, Civ. No. PJM 13-2586, at ECF No. 84. The Court of Special Appeals of Maryland, however, reversed that decision and remanded the case to the Circuit Court, finding that a genuine dispute of material fact existed as to whether Mr. Peebles was a member of the Board. The appeals court's mandate issued on October 19, 2012, and it does not appear that the issue has been resolved finally in the Circuit Court. (*Id.* at ECF No. 114).

---

§ 1983. Prince George's County removed the case to the United States District Court for the District of Maryland, and Judge Messitte remanded the case to Prince George's County Circuit Court by memorandum opinion and order issued on October 30, 2013. *See Jericho Baptist Church Ministries, Inc. v. Peebles*, Civ. No. PJM 13-2586, 2013 WL 5915239 (D.Md. Oct. 30, 2013). The docket from Judge Messitte's case contains some of the applicable filings from the action currently pending in the Circuit Court for Prince George's County.

Mr. Peebles and Mr. Meadows filed fourth amended counterclaims, in which they characterize their case as presenting the issue "of who are the lawful members of the Board of Trustees of Jericho Baptist Church Ministries, Inc." (ECF No. 7-11 ¶ 6). The fourth amended counterclaims seek declaratory and injunctive relief and assert, *inter alia*, the following claims: (1) accounting; (2) constructive trust; (3) breach of fiduciary duty; (4) unjust enrichment; (5) intentional misrepresentation; (6) intentional misrepresentation by concealment; (7) violation of Md. Code, Corps. & Assoc. § 5-302; and (8) constructive fraud.[5] (*See* ECF No. 7-11).

Defendants believe that *Trustees v. Peebles* and the instant action meet the requirements for parallel suits. They argue:

> [The two lawsuits] involve substantially the same parties, *i.e.*, Jericho Maryland, the Trustees, and parties who are locked in a dispute with the Trustees over control of Jericho Maryland; and substantially the same issues, *i.e.*, who rightfully controls the church and whether the Trustees have, or have not, committed self-dealing, mismanagement, breach of fiduciary duties, and other alleged wrongs.

(ECF No. 7-1, at 11-12).

---

[5] On February 25, 2014, Mr. Peebles and Mr. Meadows dismissed their third-party claims against the Governmental Third-Party Defendants in the Circuit Court for Prince George's County. (*See* ECF No. 7-13, stipulation of dismissal). Defendants indicate that the remainder of the fourth amended counterclaims remain pending. (*See* ECF No. 7-1, at 11).

Defendants' arguments are unavailing.  Plaintiff is not a party to the state court action.  *See, e.g., Cognate BioServices, Inc. v. Smith*, Civ. No. WDQ-13-1797, 2014 WL 988857, at *4 (D.Md. Mar. 12, 2014) ("In this case, the four additional plaintiffs and Alan Smith Consulting are not parties in the state case.  Abstaining in favor of the state proceeding would deprive the four plaintiffs of the opportunity to litigate their claims."); *Great American Ins.*, 468 F.3d at 208 ("In this case, [plaintiff] is not a party to any of the Alabama state court actions.  Accordingly, to abstain in favor of the Alabama state court actions would deprive [plaintiff] of the opportunity to litigate its claims.").  Moreover, although the state court action undoubtedly arises out of the same set of facts – *i.e.,* the schism within the Church between Defendant Trustees and supporters of Joel Peebles – the parties, legal issues, and the remedies sought in the two cases are sufficiently distinct.  It does not appear that the fourth amended counterclaims are asserted derivatively on behalf of the Church; instead, Joel Peebles and Mr. Meadows seek a ruling from the court that the Defendant Trustees are "not members of the Board of Trustees of the Church, and that the ['real'] Board of Trustees consists only of Pastor Joel Peebles, Elder Meadows, and Deacon Wesley." (ECF No. 7-11, at 46).  The instant lawsuit does not center around membership *of the Board* of Trustees, however.  It appears

14

that in the state court action, both the Trustees and Joel Peebles purport to represent the interests of the Church, although none of the counterclaims are raised derivatively. Moreover, on April 18, 2012, Defendant Trustees sent an expulsion letter to Joel Peebles, terminating his employment with Jericho Maryland and expelling him from membership in the Church pursuant to Article 2.15 of the By-Laws. (*See* ECF No. 7-10).   In contrast, the instant dispute involves a derivative lawsuit brought by a purported member of the Church on its behalf essentially alleging misappropriation of Church funds by Defendant Trustees.

The Fourth Circuit explained in *Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 248-49 (4th Cir. 2013):

> Because *Colorado River* abstention is premised on consideration of "wise judicial administration" rather than the "weightier considerations of constitutional adjudication and state-federal relations" underpinning other abstention doctrines, *Colorado River*, 424 U.S. at 818, its application is proper in a "more limited" range of circumstances, *id.*   When courts consider requests to abstain, the task "is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court, rather, our task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, . . . to justify the *surrender* of that jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983) (internal quotation marks omitted).

(emphasis in original).

Because the two proceedings are not parallel, the court need not consider the factors justifying "exceptional circumstances" under *Colorado River*.

## C. Standing

Any plaintiff seeking to invoke the jurisdiction of a federal court must establish standing. The doctrine of standing consists of two distincts "strands": constitutional standing pursuant to Article III and prudential standing. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). The requirements for constitutional standing reflect that Article III "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1993) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."). To establish Article III standing, a plaintiff must demonstrate that:

> (1) [she] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011) (*quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).   In contrast to Article III standing, prudential standing "'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'"   *Elk Grove Unified Sch. Distr.*, 542 U.S. at 11.   One such limitation is that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"   *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Analysis of the standing question in this case involves further prudential concerns, given the religious institution that is at the heart of the controversy.   Matters of ecclesiastical doctrine sometimes are not amenable to review by civil courts.   As the Fourth Circuit reasoned in *Dixon v. Edwards*, 290 F.3d 699, 714 (4th Cir. 2002):

> As we explain below, the civil courts of our country are obliged to play a limited role in resolving church disputes.   This limited role is premised on First Amendment principles that preclude a court from deciding issues of religious doctrine and practice, or from interfering with internal church government.   *When a civil dispute merely involves a church as a party, however, and when it can be decided without resolving an ecclesiastical controversy, a civil court may properly exercise jurisdiction.*   The courts must avoid any religious inquiry, however, and they may do

so by deferring to the highest authority
within the church.

(emphasis added). "In keeping with the First Amendment's
proscription against the 'establishment of religion' or
prohibiting the 'free exercise thereof,' civil courts have long
taken care not to intermeddle in internal ecclesiastical
disputes." *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328,
330 (4th Cir. 1997). The Fourth Circuit explained in *Bell*, 126
F.3d at 331:

> Although *Gonzalez* [*v. Roman Catholic
> Archbishop*, 280 U.S. 1 (1929)] and other cases
> allowed the possibility of "'marginal civil
> court review' under the narrow rubrics of
> 'fraud' or 'collusion' when church tribunals
> act in bad faith for secular purposes," the
> Court in *Serbian Eastern Orthodox Diocese v.
> Milivojevich*, 426 U.S. 696 (1976), abandoned
> any "arbitrariness" exception, moving yet
> further from any role for civil courts in
> ecclesiastical disputes. *Id.* at 713. *It
> has thus become established that the
> decisions of religious entities about the
> appointment and removal of ministers and
> persons in other positions of similar
> theological significance are beyond the ken
> of civil courts.* Rather, such courts must
> defer to the decisions of religious
> organizations "on matters of discipline,
> faith, internal organization, or
> ecclesiastical rule, custom or law." *Id.*
> The Supreme Court explained, "[i]t is the
> essence of religious faith that
> ecclesiastical decisions are reached and are
> to be accepted as matters of faith whether
> or not rational or measurable by objective
> criteria." *Id.* at 714-15.

(emphasis added).

The First Amendment does not remove from the purview of civil courts, however, all controversies involving religious institutions. *Jones v. Wolf*, 443 U.S. 595, 602-03 (1979); *American Union of Baptists, Inc. v. Trustees of Particular Primitive Baptist Church at Black Rock, Inc. et al.*, 335 Md. 564, 574 (1994) ("Each set of circumstances must be evaluated on an individual basis by the court to determine whether, under the facts of that particular case, a court would be forced to wander into the 'theological thicket' in order to render a decision."). Maryland courts opt to apply neutral civil law principles whenever possible to resolve church disputes that do not involve doctrinal implications. *See American Union of Baptists, Inc.*, 335 Md. at 575 ("Although the line separating those disputes which are grounded in religious doctrine from those which concern purely secular matters is often difficult to discern, we have in many cases been able to resolve church property disputes with the application of neutral principles of law."); *Babcock Mem. Pres. Ch. v. Presbytery*, 296 Md. 573 (1983) (resolving interests in property by determining whether the church polity was congregational or hierarchical in nature; such an inquiry required application of neutral principles of law).

Issues of standing are analyzed under the rubric of a motion for lack of subject matter jurisdiction. *See Taubman Realty Grp. Ltd. P'Ship v. Mineta*, 320 F.3d 475, 480-81 (4th Cir.

2003) (affirming district court's dismissal of complaint for lack of standing pursuant to Fed.R.Civ.P. 12(b)(1)); *Gonyo v. Midland Funding, LLC*, No. CCB-11-3117, 2012 WL 2564711, at *2 (D.Md. June 29, 2012) (evaluating whether a party has standing pursuant to Rule 12(b)(1)).   A challenge to standing may take two forms: a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish standing, or a factual challenge asserting "'that the jurisdictional allegations of the complaint [are] not true,'" or that other facts, outside the four corners of the complaint preclude the exercise of subject matter jurisdiction.   *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *see also Potomac Conference Corp. of Seventh-day Adventists v. Takoma Academy Alumni Ass'n, Inc.*, 2 F.Supp.3d 758, 765-66 (D.Md. 2014).

Plaintiff asserts in the complaint that she has standing because she has been a congregational member of the Church for over six (6) years and remains a congregational member.   (ECF No. 1 ¶¶ 4-5).   Defendants dispute that Plaintiff currently is a member of the Church and submit evidence to the contrary.[6]   When

---

[6] Some of Defendants' filings contain personal identifying information, including social security number and birthday. (*See* ECF Nos. 7-9 & 7-16, at 3).   Pursuant to Fed.R.Civ.P. 5.2, personal identifying information should have been redacted.   "It is the responsibility of counsel and the parties to redact personal identifiers.   The clerk will not screen documents and

a defendant "challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009).  If the defendant challenges the factual predicate of subject matter jurisdiction, then "a district court may hold an evidentiary hearing to determine whether the facts support the jurisdictional allegations."  *United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999).  However, when an attack on the facts alleging subject matter jurisdiction is intertwined with the merits of a dispute, "it may be appropriate to resolve the entire factual dispute at a later proceeding on the merits." *In re Mut, Funds Inv. Litig.*, 430 F.Supp.2d 434, 440 (D.Md. 2005).  The Fourth Circuit summarized in *Kerns*, 585 F.3d at 193:

> As we explained in *Adams* [*v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)], vesting a district court with the discretion to determine whether it possesses jurisdiction generally presents no problems. [] But as Judge Sprouse cautioned in *Adams*, "where the jurisdictional facts are intertwined with the facts central to the merits of the dispute," a presumption of truthfulness should attach to the plaintiff's allegations.  *Id.  In that situation, the*

will not reject them on the basis that they contain personal identifiers.   Any party may request that a publicly filed document containing a full personal identifier be withdrawn and refiled with appropriate redactions." *See* Privacy Policy – Civil Cases (2004).  Accordingly, ECF Nos. 7-9 and 7-16 will be placed under seal and Defendants will have seven (7) days to file redacted versions.

> *defendant has challenged not only the court's jurisdiction but also the existence of the plaintiff's cause of action. A trial court should then afford the plaintiff the procedural safeguards – such as discovery – that would apply were the plaintiff facing a direct attack on the merits.*
>
> . . .
>
> In short, when a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the trutfulness of the facts alleged. On the other hand, when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts. *And when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the allegations are clearly immaterial or wholly unsubstantial and frivolous.*

(emphases added).

Here, Defendants make a factual challenge, arguing that Plaintiff's complaint includes jurisdictional allegations – that she is a member of the Church – that are not true. *See, e.g., Askew v. Trustees of General Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 418 (3[d] Cir. 2012) ("Misappropriation of church assets could have caused Askew injury-in-fact, as an individual or derivatively, only if he is a member of the Church."). Plaintiff asserts in the

complaint that she has been a member of *the Church* for over six years.[7]   (ECF No. 1 ¶ 4).   Defendants submit an affidavit from Denise Killen, the Chairman of the Board of Trustees of Jericho Baptist Church Ministries, Inc., stating that "[a]ccording to Jericho Maryland's records, Plaintiff Renee Franklin is not a member of Jericho Maryland."   (ECF No. 7-2 ¶ 6).   Ms. Killen further avers that all members are expected regularly to tithe, which includes giving one-tenth of their income to the Church; according to Ms. Killen, "[a]lthough Plaintiff made sporadic donations to Jericho Maryland when Mr. Peebles used to perform religious services for Jericho Maryland, Plaintiff appears to have stopped attending services and making any monetary contributions to Jericho Maryland in 2011."   (*Id.*).   Ms. Killen states, however, that Plaintiff attended services at the Church on February 23, 2014 – three days after the complaint was filed – and presented a check for $12.50.[8]   (*Id.* ¶ 7).   Ms. Killen

---

[7]   Defendants argue that having incorporated in December 2010, Jericho Maryland has existed only for four years, thus Plaintiff could not have been a member of Jericho Maryland for over six years.   Plaintiff's ability to bring claims on behalf of the Church, however, does not appear to hinge on her membership in Jericho Maryland, the *non-profit corporation*.   *See Askew v. Trustees of General Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 644 F.Supp.2d 584, 590-91 (E.D.Pa. 2009) (explaining difference between claims derivative of the corporation's rights as opposed to claims derivative of the Church).

[8]   Ms. Killen states that the check was not cashed or deposited.

wrote a letter to Plaintiff, dated March 5, 2014, stating, in relevant part:

> Thank you very much for your check in the amount of $12.50 that Jericho City of Praise received on February 23, 2014.
>
> According to our records, you have not attended any services at Jericho in a couple of years. If your gift was a one-time donation because you were just visiting with us, we sincerely appreciate your generosity. *If, however, you are currently without a church home, we invite you to become a member of Jericho.*
>
> Our Solid Foundation class, which is required for new and returning members, meets on Friday evenings from 7 p.m. to 9 p.m. To register, you can contact me directly or speak with any member of the ministry team seated at the pulpit following the 9:30 a.m. Sunday morning service.

(ECF No. 7-18, at 2) (emphasis added). Although Plaintiff has not submitted an affidavit, she states in the opposition to Defendants' motion that she has neither stopped attending services and tithing nor relinquished her membership in the Church. (ECF No. 10, at 11). The court need not resolve the factual disputes between the parties, however, because resolution of the standing issue – *i.e.,* whether Plaintiff is a member of the Church – is inextricably intertwined with the merits of the derivative causes of action Plaintiff asserts. Specifically, Plaintiff's ability to bring derivative claims turns on her membership in the Church. Furthermore, the

allegations in the complaint suggest that Plaintiff challenges whether Defendant Trustees are the "true" trustees on the Board with authority to make determinations as to Church membership.

Defendants contend, however, that the court cannot review the determination that Plaintiff is not a member of the Church. They assert that "[t]he unreviewable nature of decisions regarding *church discipline* is a staple in American jurisprudence and mandated by the United States Constitution." (ECF No. 7-1, at 15-16) (emphasis added).  In this case, however, the record does not reflect that Plaintiff's membership was terminated, let alone that any disciplinary action had been taken against her.  Moreover, it is not clear from the record whether at some point Plaintiff was recognized as a member of the Church (*e.g.,* in 2011).

In *American Union of Baptists*, 335 Md. at 577, the court stated: "[i]t is well settled in this State that the determination of a membership in a church is a question well embedded in the 'theological thicket' and one that will not be entertained by the civil courts."  The court in *American Union of Baptists* cited *Evans v. Shiloh Baptist Church*, 196 Md. 543, 551 (1950), for this proposition.  In *Evans*, the court reasoned:

> In the *Jenkins* case we held that, assuming the expulsion of the appellants to be unlawful, their expulsion was a case of discipline, [], which the courts would not pass upon, *where no property interest is*

> *involved.   As we held that no property interest was involved in expulsion from membership, manifestly no property interest is involved in suspension or other similar discipline short of expulsion.*   Long before the *Jenkins* case it had been held that *membership is an ecclesiastical matter*, as to which the courts will not review the action of the ecclesiastical authorities.

(internal quotation marks omitted) (emphases added).   In both cases, the court determined that membership in a Church was an ecclesiastical matter where the reason for expulsion of a member or refusal to recognize an individual as a Church member turned on religious principles.   For instance, after stating that membership in a Church will not be reviewed by civil courts, the court in *American Union of Baptists*, 335 Md. at 577-79, observed:

> *The record in this case* only emphasizes this point; Osborne's refusal to recognize the congregation of the church as "members" is apparently grounded in the fact that the congregation allegedly allows an "open communion."   Clearly, the propriety *vel non* of an "open communion" in the Primitive Baptist faith is not within the purview of the civil courts.   Yet, such a determination is crucial to the ability to decide whether the church had valid "members."  . . . *Again, in order to decide this matter, we would be required to resolve the property disposition based on our interpretation of religious custom and polity.*   This we cannot do.

(emphases added).

The record here indicates that the question of who is or is not a Church member depends in part on religious practice. The Articles of Incorporation of The Jericho Baptist Church Ministries, Inc. state that "[m]embership to the Church shall be open [to] all who accept Jesus Christ as Lord." (ECF No. 7-8, at 6). The Articles of Incorporation further provide that "[t]he number, qualifications of, and other matters relating to, its Members shall be as set forth in these Articles of Incorporation and the By-Laws of the Church." (*Id.*). Article 10.2 of the By-Laws covers Non-Trustee membership in the Church:

> a. <u>Qualifications for Membership</u>. Non-Trustee Membership in the Church shall be open to all those persons over eighteen (18) years of age who give evidence of their faith in the Lord Jesus Christ, exhibit a consistent Christian life, voluntarily subscribe to the Tenets of Faith of the Church, are baptized, and are recognized as members after fulfilling the qualifications of membership and in accordance with the Church's established membership process, which process may be changed from time to time.

> b.<u>Suspension, Revocation, and/or Termination of Non-Trustee Membership</u>. The Board of Trustees may suspend, revoke and/or terminate the membership of any non-Trustee member of the Church when a member has engaged in conduct detrimental to the interests of the Church, moral turpitude, for lack of sympathy of its objectives, refusal to render reasonable assistance in carrying out its purposes (including but not limited to financially supporting the ministry as determined by the Board), or otherwise failing to meet the qualifications

for membership, at the sole discretion of
the Board of Trustees, which shall be deemed
to be reasonable.   Such action(s) may be
made by the Board of Trustees without the
need   for   notice   of   warning,   by   the
affirmative vote of two-thirds of the full
Board of Trustees, at any regular or special
meeting   called   for   that   purpose.   Such
person   will   be   required   to   leave   the
premises of the Church on a permanent basis.

c.   <u>Non-Trustee   Membership   Roster</u>.   The
Secretary of the Board of Trustees shall be
responsible for maintaining and updating the
roster of current non-Trustee members of the
Church.

(ECF No. 7-19, at 16-17).[9]

Defendants cite Plaintiff's sporadic church attendance and
failure to tithe regularly as reasons for not recognizing her
membership,   factual   assertions   that   Plaintiff   *disputes*.
Defendants have not provided evidence regarding who decides
whether someone is or is not a member of the Church, and how
that   determination   is   communicated   to   purported   members.
Moreover, unlike cases cited by Defendants, the record *so far*
does   not   present   a   situation   where   the   Church   explicitly
terminated membership and the dispute requires the court to
delve into religious doctrine, which would fall with the realm
of matters insulated from civil court review.

---

[9] The By-Laws also state that there shall be two (2) classes
of membership, one of which consists of Trustee members of the
Church and another consisting of all non-Trustee members of the
Church.   (ECF No. 7-19, at 16).

Additionally, Plaintiff asserts that Defendants disavow her membership in order to circumvent this lawsuit. She submits two exhibits evidencing termination letters sent from the Board of Trustees to purported Church members, allegedly after such individuals had either sued the Board of Trustees or indicated an intention to sue. (ECF No. 10, at 17-18).[10] Plaintiff avers that she "knew that once she filed suit against the Board[,] her membership would be challenged, because said tactic of denouncing membership has been employed before by the Board. The Board revokes membership through correspondence to the excommunicated member by letter, and [] Plaintiff never received any excommunication letter." (*Id.* at 11; *see also id.* at 17-18). Plaintiff states that she tithed in cash prior to February 2014 "knowing that her membership would be challenged [and] she [] would need proof [of] her membership." (*Id.* at 10). Plaintiff in *Askew* similarly alleged that the Church terminated

---

[10] In their papers, Defendants reference another case from the Circuit Court for Prince George's County arising out of the same dispute: *Chavez, et al. v. Jericho Baptist Church Ministries, Inc., et al.*, Case No. CAL12-13537. Plaintiffs in that case sought injunctive relief, alleging that the Board of Trustees failed to hold mandatory elections for trustees. (*See* ECF No. 7-15). The court addressed the issue of whether plaintiffs in that case were members of Jericho Baptist Church Ministries at the time of the election of the Board of Trustees. (*Id.* at 3). Judge Jackson on the Circuit Court issued a memorandum opinion on January 28, 2014, stating that "[b]y their own submission, Plaintiffs do not dispute that they were *not* members of the Maryland church that was formed on October 30, 2010." (*Id.* at 6). In that case, discovery was conducted and depositions had been taken. (*See* ECF Nos. 7-15 & 7-16).

his membership as a post hoc decision made for the impermissible purpose of divesting the district court of jurisdiction. The Third Circuit remarked:

> A doctrinally grounded decision made during litigation to insulate questionable church actions from civil court review may indeed raise an inference of fraud or bad faith. . . . *Under those circumstances, the integrity of the judicial system may outweigh First Amendment concerns such that a civil court may inquire into the decision.* But we find no basis for the inference here. Since 1992, Bishop Shelton has repeatedly declared all persons loyal to Roddy Shelton nonmembers of the Church. Askew admittedly associated with the minority faction led by Roddy Shelton. His membership in that class of individuals undercuts any inference that Bishop Shelton first declared him a nonmember in 2009 in order to thwart review by the District Court.

*Askew*, 684 F.3d at 420-21 (emphasis added). Unlike in *Askew*, Plaintiff asserts that Defendants disavow her membership for purposes of avoiding being sued and the evidence offered by Defendants does not conclusively establish that Plaintiff is not a member of the Church. Indeed, Defendants intimate that at some point in 2011, Plaintiff may have been a member of the Church.

Defendants also argue that even if Plaintiff were a Non-Trustee member of Jericho Maryland, she would not have standing to bring this lawsuit because she has no property rights in Jericho Maryland. (ECF No. 7-1, at 15-16). Defendants

30

reference Article 10.1 of the By-Laws, which states that *voting rights* for any and "all matters regarding or affecting the governance or operation of the Church . . . which shall include but not be limited to the receipt, purchase, sale or transfer of real or personal property" are granted exclusively to Trustees of the Church.   (ECF No. 7-19, at 16).   The By-Laws further state that "[n]on-trustee members of the Church shall not have nor be entitled to have *voting rights* regarding the governance or operation of the Church." (*Id.*)   (emphasis added).   This provision relates to voting rights, however, and does not necessarily insulate Defendant Trustees from this lawsuit involving allegations of misuse of Church funds.

Based on the foregoing, the record does not conclusively establish that Plaintiff is not a member of the Church, or that resolution of the matter would entail delving into ecclesiastical matters.   Moreover, the issues may well be so intertwined with the merits so as to be incapable of resolution separately, considering that Plaintiff's ability to bring claims derivatively on behalf of the Church turns on her standing as a Church member.   Accordingly, Defendants' challenge to Plaintiff's standing will be denied.

31

**D. Remaining Arguments**

**1. Demand Futility**

All but one of Plaintiff's claims are derivative, thus she must comply with Fed.R.Civ.P. 23.1(b). Among other requirements, Rule 23.1(b) mandates that the complaint in a derivative action be verified and "state with particularity":

> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
>
> (B) the reasons for not obtaining the action or not making the effort.

Fed.R.Civ.P. 23(b)(3). The pleading standard "for excusing demand is defined in a federal derivative action by the law of the State of incorporation," *Weinberg v. Gold*, 838 F.Supp.2d 355, 357 (D.Md. 2012), which, in this case, is Maryland. Under Maryland law, a member of a corporation can file a derivative action if "members with authority to bring the action have refused to bring the action or if an effort to cause those members to bring the action is not likely to succeed." Md. Code Ann., Corp's & Assoc. § 4A-801(b). Maryland courts have interpreted the latter half  of this provision as creating a "futility" exception to the demand requirement. *Wasserman v. Kay*, 197 Md.App. 586, 627-28 (2011) ("[I]t is clear that the legislature intended the phrase 'not likely to succeed' to equate with 'futility.'"). To sustain a derivative action, a

32

plaintiff therefore must establish either that she made a demand of members of authority to file suit and failed to garner majority approval, or that she did not make such a demand because doing so would have been futile.

In *Werbowsky v. Collomb*, 362 Md. 581 (2001), the Court of Appeals of Maryland reviewed at length the evolution of the standard for demand futility both in Maryland and beyond.[11] The court noted that it was unwilling to excuse demand

> simply because a majority of the directors
> approved or participated in some way in the
> challenged transaction or decision, or on
> the basis of generalized or speculative
> allegations that they are conflicted or are
> controlled by other conflicted persons, or
> because they are paid well for their
> services as directors, were chosen as
> directors at the behest of controlling
> stockholders, or would be hostile to the
> action.

*Id.* at 618. "Noting that, in some cases, the demand may be the directors' 'first knowledge that a decision or transaction they made or approved is being questioned,' the [*Werbowsky*] court indicated directors might respond by seeking the advice of a special litigation committee of independent directors or by acceding to the demand rather than risking embarrassing

---

[11] The court in *Werbowsky* considered the various standards for demand futility, but declined to adopt either the Delaware approach or the models proposed by the American Bar Association and the American Law Institute.

litigation." *Weinberg*, 838 F.Supp.2d at 359 (*quoting Werbowsky*, 362 Md. at 619).   The *Werbowsky* court concluded:

> We adhere, for the time being, to the futility exception, but, consistent with what appears to be the prevailing philosophy throughout the country, *regard it as a very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner*, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) *a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.*

*Werbowsky,* 362 Md. at 620 (emphases added).

Plaintiff has offered the following reasons for excusing demand on the Board before initiating this lawsuit:

1. Anyone who questions the activities of the Board has been silenced in one form or another, which is evidenced by the Board's civil action [] against Bishop Joel Peebles, Sr. to illegally terminate his employment and remove him from the Board with the Nominal Defendant;

2. Members of the Nominal Defendant's congregation requested access to the Nominal Defendant's records pursuant to Corporations and Associations Code § 5-307 with no cooperation from the Defendants which left five (5) members of the Nominal Defendant's congregation with no choice but to file suit [] to enforce their rights;

3. Members of the Nominal Defendant's congregation have filed suit [] to enforce

their rights under Corpirations and Associations Code § 5-302 [] because the Board refused and continues to refuse to follow the mandates of § 5-302 and allow the members of the Nominal Defendant to vote to elect the trustees;

4. Members of the Nominal Defendant that have questioned the actions of the Board have been removed from the Nominal Defendant's property under police escort;

5. Members of the Nominal Defendant have expressed and requested in writing their objection to their church tithes and offerings being used to sue Bishop Joel Pebbles, Sr., and [] Defendants continue to use church tithes and offerings to sue Bishop Joel Pebbles, Sr., and deny members of the Nominal Defendant their statutory rights;

6. In order to bring this suit[], [] Defendants would be forced to sue themselves and persons [with] whom they have extensive business and personal entanglments, which they will not do, and makes demand futile and useless;

7. The acts complained of herein [] constitute violations of Maryland State law and the fiduciary duties owed by the Nominal Defendant's trustees and officers and those actions are incapable of ratification;

8. Each of the trustees and officers authorized the illegal actions of the Board complained of herein[], and having acquiesced to the misconduct and illegal actions cannot fully and fairly prosecute such suit, even if such a suit was initiated;

9. [] Defendants cannot be relied upon to reach a truly independent decision as to whether to commence an action against

themselves or other trustees and/or officers for the misconduct alleged herein[], in that *inter alia*, [they are] controlled by Defendants[] Killen and Jackon, who have personally benefited from the misconduct. Defendants[] Killen and Jackson's[] dominion over the Board has impaired its ability to exercise proper business judgment and rendered it incapable of reaching an independent decision as to whether to accept [] Plaintiff's demand;

10. Any suit to remedy the wrongs alleged [] herein [] by the Board would likely expose the Defendants to civil liability and criminal liability, and thus they are hopelessly conflicted in making an independent decision to file suit against themselves or any other trustee and/or officer of the Nominal Defendant;

11. Defendants[] Killen, Williams, and Jackson, are each interested because they face substantial civil liability and criminal culpability for their misconduct in handling the Nominal Defendant's finances. In their roles as officers of the Nominal Defendant they were responsible for maintaining the accuracy and integrity of the Nominal Defendant's financial report.

(ECF No. 1 ¶ 31).

Plaintiff's justifications for failing to make a demand are insufficient under the futility exception recognized by Maryland law. For instance, Reasons 3 and 7 – regarding violations of state law, Md. Code 5-302, and breach of fiduciary duty – go to the merits of the case, and *Werbowsky* disallows consideration of the merits of the case in analyzing

demand futility. *Werbowsky*, 362 Md. at 620 (noting that standard for demand futility under Maryland law "focuses the court's attention on the real, limited issue – the futility of a pre-suit demand – and avoid injecting into a preliminary proceeding issues that go more to the merits of the complaint – whether there was, in fact, self-dealing, corporate waste, or a lack of business judgment with respect to the decision or transaction under attack."; *Weinberg*, 838 F.Supp.2d at 361 (finding insufficient to show demand futility explanation related to merits of the lawsuit). Reasons 6, 10, and 11 similarly are insufficient to justify application of the futility exception. As explained in *Weinberg*, 838 F.Supp.2d at 360, "merely because directors are named in the instant suit does not mean that *prior to the suit*, a demand would have been futile." (emphasis added); *Seidl v. American Century Companies, Inc.*, 713 F.Supp.2d 249, 260 ("[P]laintiff's conclusory allegation that ACMF's directors will be exposed to civil and criminal liability is inadequate to excuse demand under Maryland law. Furthermore, plaintiff cannot circumvent the demand requirement by alleging that the directors engaged in inherently criminal activity."). Judge Bredar explained in *Weinberg*, 838 F.Supp.2d at 360-61, that important considerations underlying the demand requirement in derivative lawsuit "would be nullified in every shareholder's derivative suit that named

37

directors as defendants if simply naming them as parties provided excuse for pre-suit demand." *See also In re Regions Mortgan Keegan Sec., Derivative & ERISA Litig.*, 694 F.Supp.2d 879, 887-88 (W.D.Tenn. 2010) (possibility directors may have to sue themselves did not waive demand under Maryland law).

Next, reasons 8 and 9 that the Board is controlled by Defendants Killen and Jackson, who have a personal financial stake, and that each Trustee purportedly was involved in the challenged conduct, are speculative and conclusory. *See Werbowsky*, 362 Md. at 618 ("[We] are not willing to excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, . . . or would be hostile to the action."). Moreover, Killen and Jackson are only two out of the six members of the Board, and the *Werbowsky* standard applies where a *majority* of the directors are so personally and directly conflicted. *See Weinberg*, 838 F.Supp.2d at 360 ("But Gold and Kreitzer are only two out of seven members of the board, which means that at least two more members of the board would have to be personally disqualified before the *Werbowsky* standard is satisfied.").

The remaining allegations are similarly insufficient. Plaintiff states that members of the Church have requested that their donations not be used in litigation against Joel Peebles, and those requests have not been honored, but that has nothing to do with whether the Board would be hostile to a demand to sue. Moreover, although Plaintiff asserts that "members" of the Nominal Defendant who have challenged the actions of the Board have been removed under police escort, she recounts only a single incident involving the alleged removal of Joel Peebles under police escort, an allegation in the fourth amended counterclaims filed by Mr. Peebles in the Circuit Court for Prince George's County. Furthermore, she states that "anyone who questions the activities of the Board has been silenced in one form or another," but this assertion falls within the category of "generalized or speculative allegations" that the Board would be hostile to the action, considered by *Werbowsky* as inadequate to excuse demand.

Based on the foregoing, Plaintiff has not offered sufficient allegations in the complaint to excuse demand under the futility exception recognized by Maryland law. Accordingly, the derivative claims will be dismissed.

**2. Section 5-302**

Plaintiff brings a direct claim for violation of Md. Code, Corps. & Assoc. § 5-302.  Section 5-302 governs the contents of plans of religious corporation, and states, in relevant part:

> (a)   The adult members of a church may form a religious corporation as provided in this part.
>
> (b)   The members shall:
>
> (1)   Elect at least four inidividuals to act as trustees in the name of and on behalf of the church; and
>
> (2)   Prepare a plan of the church.

Plaintiff asserts in the complaint that she has a vested right pursuant to Section 5-302 to choose – by way of vote – the Trustees who serve on the Board of Jericho Maryland.  (ECF No. 1 ¶ 78).  In support of her claim for violation of Section 5-302, Plaintiff states that although Defendants believe that the October 30, 2010 election "validates their existence as trustees of the Nominal Defendant[,]" "[n]o election was held on October 30, 2010[] to create a new corporation [] because the corporation was already [in] existence at the time." (*Id.* ¶¶ 79-80).

Defendants question whether Section 5-302 creates a private cause of action and assert that the claim may be time-barred. It is not necessary to resolve these arguments because, as Defendants argue, Plaintiff ignores the fact that Section 5-302

40

addresses the formation of and initial plan for a corporation. *Before* a corporation is formed, the members shall "[e]lect at least four individuals to act as trustees in the name of and on behalf of the church." Md. Code, Corps. & Assoc. § 5-302(b)(1). Section 5-304 provides, in relevant part:

> (a) The trustees shall file articles of incorporation for record with the Department.
>
> . . .
>
> (c) When the Department accepts the articles of incorporation for record, the trustees become a body corporate under the name stated in the articles.

Md. Code, Corps. & Assoc. § 2-102 provides, in relevant part:

> (b)(1) When the Department accepts articles of incorporation for record, the proposed corporation becomes a body corporate under the name and subject to the purposes, conditions, and provisions stated in the articles.
>
> (2)Except in a proceeding by the State for forfeiture of a corporation's charter, *acceptance of the articles for record by the Department is conclusive evidence of the formation of the corporation.*

(emphasis added).

Here, the Articles of Incorporation for Jericho Maryland were *accepted* on December 15, 2010, which provides conclusive evidence of the formation of the corporation. This point undermines any argument by Plaintiff that no election appointing Trustees to the Board was held on October 30, 2010 because the

41

District of Columbia charter existed at the time.  The District of Columbia charter merged into Jericho Maryland.  (*See* ECF No. 7-3).  As Defendants argue, "[b]ecause the Department undeniably accepted the Articles of Incorporation for Jericho Maryland on December 15, 2010, Plaintiff's claim that the corporation already existed on October 30, 2010, inexplicably resulting in some type of violation of Section 5-302, fails." (ECF No. 7-1, at 19).

Based on the foregoing, summary judgment will be granted to Defendants on the claim alleging a violation of Section 5-302.

## III. Conclusion

For the foregoing reasons, Defendants' motion will be granted.  A separate order will follow.


                            _____/s/_____
                            DEBORAH K. CHASANOW
                            United States District Judge